UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

KENNETH P.,[1]

        Plaintiff,

    v.

ANDREW SAUL,

        Defendant.

Case No.  19-cv-05628-RMI

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 15

Plaintiff, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 8), and both parties have moved for summary judgment (dkts. 14 & 15). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

United States District Court
Northern District of California

"substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On April 28, 2016, Plaintiff filed an application for supplemental security income, alleging an onset date of September 1, 2013. *See* Administrative Record "*AR*" at 15.[2] As set forth in detail below, the ALJ found Plaintiff not disabled and denied the application on July 2, 2018. *Id*. at 36. The Appeals Council denied Plaintiff's request for review on July 10, 2019. *See id*. at 1-4. Thereafter, on September 6, 2019, Plaintiff sought review in this court (dkt. 1), contending, *inter alia*, that the ALJ erred by failing to consider a number of his mental impairments at Step Two and beyond, as well as by improperly weighing the evidence. *See* Pl.'s Mot. (dkt. 14) at 12-14. Defendant contends that the evidence was correctly weighed, and that any errors committed by the ALJ at Step Two are harmless. *See* Def.'s Mot. (dkt. 20) at 9-10.

//

//

//

---

[2] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #11. *See* (dkts. 11-1 through 11-16). Additionally, the AR in this case has been improperly filed in that a large portion of the record has been scanned in a manner that has resulted in alternating pages being disoriented such that every other page is upside-down, rendering the court's review of that portion of the record unnecessarily difficult. *See id*. at 778-826. Defendant is directed to take care to avoid repeating this mistake in the future.

United States District Court
Northern District of California

United States District Court
Northern District of California

**SUMMARY OF THE RELEVANT EVIDENCE**

*Medical Evidence*

Plaintiff has a lengthy history of suffering mental illness and being subjected to psychiatric hospitalizations which long predates his alleged onset date. *See AR* at 472. He was hospitalized for several days in 1993 due to depression and suicidality, as well as attending a 20-week mental health program in 2003, albeit in an outpatient clinical setting. *Id*. Now in his late 40s – Plaintiff has experienced sporadic homelessness since 2007, he has attempted suicide on multiple occasions, and, he has been admitted for psychiatric hospitalization on more than a few occasions (particularly during the period between 2013 and 2014). *See id.* at 594. In November of 2007, he underwent a consultative examination by Faith Tobias, Ph.D., in the course of which, Dr. Tobias noted Plaintiff's history of auditory hallucinations, his history of paranoid and suicidal ideations, as well as his history of bipolar disorder and attention-deficit / hyperactivity ("ADHD") disorder. *Id*. at 464, 466. Dr. Tobias noted Plaintiff's manifestation of depressive symptoms, anxiety symptoms, and psychotic symptoms, in that during the course of the evaluation, "[h]is mood ranged from pleasant, to neutral, to anxious, to depressed. At times he was tearful. His thought content was notable for mild paranoid ideation . . . [but] did not appear overtly psychotic." *Id*. at 467. Ultimately, in 2007, Dr. Tobias diagnosed Plaintiff with a mood disorder attended with psychotic features, explaining that the condition would cause mild to moderate impairment in Plaintiff's ability to withstand stress, maintain emotional stability, or interact with others. *Id*.

In May of 2009, Plaintiff was admitted to the John George Psychiatric Hospital and was treated by Heather Clague, M.D., for depression and bipolar disorder. *Id*. at 842-43. Dr. Clague noted Plaintiff's history of suicide attempts, one of which involved Plaintiff's unsuccessful attempt at taking his own life by cutting his wrists; in which regard, he said to Dr. Clague, "[i]t doesn't work, I can't seem to die." *Id*. at 842. Dr. Clague also noted that Plaintiff reported disturbing nightmares (several times a week) that were related to his sexual victimization as a child. *Id*. Plaintiff was discharged the same day following a diagnosis for bipolar disorder, but his exit evaluation noted his continued risk for suicide. *Id*. at 844-45.

Two years later, in 2011, he was involuntarily committed to a psychiatric hospital during a

72-hour period for fear that he was a danger to himself. *Id.* at 866. During the same period, in March of 2011, he underwent a second consultative evaluation with Dr. Tobais. *Id.* at 471-74. In the course of this evaluation, Dr. Tobias administered cognitive function examinations and while finding Plaintiff's full scale IQ score to be situated within the average range, Plaintiff's scores reflected borderline intellectual functioning in the following categories: processing speed, visuomotor skills, coordination, cognitive flexibility, concentration, psychomotor speed, attention, symbol searching, and coding. *Id.* at 473. Once again, Dr. Tobias found that Plaintiff exhibited a "mood that was moderately to markedly depressed, and [that] he was frequently tearful." *Id.* at 474. Thus, Plaintiff was now diagnosed with major depressive disorder, and Dr. Tobias opined that he was mildly impaired in his ability to maintain adequate pace or persistence to perform even one-step tasks that were simple and repetitive; as well as being mildly to moderately impaired in his ability to interact with others; and, that he was moderately to markedly impaired in his ability to withstand the stress of a routine workday, or to maintain emotional stability and predictability. *Id.*

Two years later, in December of 2013, Plaintiff was admitted to psychiatric hospitalization for another overnight stay due to his "acutely worsened depression and anxiety, accompanied by suicidality, in the setting of [a] recent loss of relationship." *Id.* at 867, 869. His history of suicide attempts and ideations, as well as his history of depression and anxiety were noted; and, this time, Michael Vilania, M.D., diagnosed Plaintiff with depressive disorder and anxiety disorder, finding him a danger to himself in that he continued to occupy a high level of risk for suicide. *Id.* at 867-69. Upon discharge, Plaintiff's condition was noted as being marked with hopelessness and impulsivity, such that he continued to occupy a high risk of suicidality. *Id.* at 870.

Less than four months later, in March of 2014, he was once again admitted to the psychiatric hospital due to suicidality and – despite doctors' difficulty in interviewing him due to the fact that he was sleeping and could not be roused – he was again diagnosed with anxiety and depression. *Id.* at 859. After an overnight stay, Plaintiff was examined again and discharged by Thomas Yun, M.D., with Dr. Yun noting that Plaintiff continued to be at risk for suicide because he continued to experience psychosis and acute stressors. *Id.* at 861-862, 864. A few weeks later,

United States District Court
Northern District of California

4

in April of 2014, Plaintiff was back in the psychiatric hospital for depression and suicidal ideations that had come close to implementation; Plaintiff told doctors that he had tried to stab himself with something sharp. *Id*. at 852. Undergoing treatment by Sandhya Dubey, M.D., he was diagnosed with depressive disorder, and he was once again deemed to be a danger to himself due to his persistent suicidal ideations, which, this time, had been attended with a specific plan. *Id*. at 853. After one night of hospitalization, coupled with being medicated with Risperidone (designed to treat schizophrenia, bipolar disorder, and irritability) Plaintiff was discharged when Erick Rizzotto, M.D., noted that his agitation had decreased and his condition had stabilized. *Id*. at 854. Again, upon discharge, his treatment providers noted the persistence of his suicidal ideations, his hopelessness, and his poor social support. *Id*. at 856. In September of 2015, he was once again admitted to the same psychiatric hospital, treated by Michael Hoeffer, M.D., he was diagnosed with a depressive disorder, and medicated him with Ativan (an anti-anxiety medication). *Id*. at 847-49. Upon discharge, his treatment providers noted his history of suicide attempts, as well as his suicidal ideations. *Id*. at 850.

During this period – namely, from 2013 to 2015 – Plaintiff's physicians (notably, Christopher Zamani, M.D.) at the Native American Health Center consistently diagnosed him with a chronic variety of each of the following mental illnesses: bipolar disorder, anxiety disorder, depressive disorder, and posttraumatic stress disorder ("PTSD"). *Id*. at 489-91, 495-96, 498-500. A few months later, in March of 2016, he was again diagnosed with depression by Tarun Arora, M.D., at the Marin General Hospital upon being taken there by a stranger who had found Plaintiff "crying on a curb." *Id*. at 599. Less than five months later, in August of 2016, Plaintiff underwent a consultative evaluation with Kyle Van Gaasbeek, Psy.D., wherein his history of childhood sexual victimization, his multiple suicide attempts, and his father's death by suicide in 2004 were noted, albeit in a disinterested and cursory fashion. *Id*. at 593-94. Nevertheless, Plaintiff was once again observed as having a dysphoric affect coupled with a "very depressed" mood. *Id*. at 595. He was diagnosed with major depressive disorder, and Dr. Van Gaasbeek opined that Plaintiff was "at least mildly impaired" in his ability perform complex tasks, to interact with others, and to complete a normal workday without interruptions from one of his psychiatric conditions; and, that

United States District Court
Northern District of California

1    he was moderately impaired in his ability to maintain regular attendance in the workplace and to

2    deal with the usual stress encountered in the workplace. *Id*. at 595-96. Shortly thereafter, Plaintiff

3    was once again diagnosed as suffering from a mood disorder, a depressive disorder, and anxiety

4    disorder – this time, by Ted Aames, Ph.D. a clinician serving as Plaintiff's long-term treating

5    psychotherapist at the Lifelong Trust Medical Center in Oakland. *Id*. at 652-53. Right off the bat,

6    Dr. Aames noted that Plaintiff's "relatively untreated anxiety and depression" were particularly

7    disturbing in light of his history of suicide attempts. *Id*. at 652.

8        Starting in 2016, and throughout 2017, Plaintiff regularly underwent psychotherapy with

9    Dr. Aames, sometimes even arriving at the office "for unscheduled visit[s] with concerns [such as]

10   difficulties coping with learning that he was denied housing by the Oakland Housing Authority

11   (due to the particulars of his past criminal record), while frequently telling Dr. Aames that on one

12   or another occasion, he had only come to say goodbye because this would be his last session for

13   one reason or another. *See e.g., id*. at 669, 724 ("But this is the last time I'm going to meet with

14   you because I'm leaving this clinic, nobody wants me here."). Dr. Aames noted that Plaintiff's

15   self-disparaging remarks evidenced his despondency, his failure to perceive his self-worth, his

16   frustration, and his intropunitive anger. *Id*. at 669. In the course of these psychotherapy sessions,

17   Dr. Aames helped Plaintiff explore his "underlying feelings of inadequacy, anxiety, and guilt /

18   shame, as well as [his] fear of rejection." *Id*. at 724. On more than one occasion, Plaintiff's

19   paranoia bubbled to the surface while waiting in the lobby of Dr. Aames's clinic, causing him to

20   fight with other patients, as well as staff, whenever he perceived that he had either been ridiculed,

21   attacked, or discriminated against because of what he described as his "low status." *Id*. at 726. On

22   one occasion, in February of 2017, Dr. Aames observed that Plaintiff was particularly "tearful,

23   weary, extremely thin, [and] distressed . . . his hands would shake when he lifted them from the

24   table and his right leg were (sic) relentlessly shaking. He evidenced despondency, anxiety, poor

25   grooming, low self-esteem, dependency, paranoid ideation, circumstantial thinking, and

26   perseveration on his relationship issues . . . and obsessive concerns about his partner's infidelity /

27   ability to love him." *Id*. at 738. During the course of Plaintiff's psychotherapy throughout 2016

28   and 2017, Dr. Aames consistently and repeatedly diagnosed him with the following mental

6

1   illnesses: chronic PTSD, the recurrent-episode type of major depressive disorder with psychotic

2   features and anxious distress, a personality disorder, and methamphetamine addiction. *See id*. at

3   669-72, 691, 698, 700, 705, 707-08, 710, 712, 715, 717, 720, 722-23, 725, 727, 728, 730, 734,

4   736, 739-40, 743, 746-47, 755, 758, 759, 762-64, 769, 771.

5   *Hearing Testimony*

6          On February 8, 2018, the ALJ conducted a hearing on this claim. *Id*. at 44-119. During the

7   hearing, the ALJ received testimony from Nathan Strahl, M.D., a non-examining psychiatric

8   expert who testified that he had been given an opportunity to review some unspecified quantum of

9   Plaintiff's medical records, but that he had never examined or treated Plaintiff. *Id.* at 59-60. When

10  asked to opine whether the records he reviewed established the presence of any medically

11  determinable mental impairments, Dr. Strahl only mentioned Plaintiff's major depressive disorder,

12  PTSD, and personality disorder – while failing to mention the diagnoses for bipolar disorder and

13  anxiety disorder, or any of the psychotic features or attendant ideations. *See id*. at 60-61. When

14  asked whether or not any of Plaintiff's impairments – individually or in combination – met or

15  equaled any listing, Dr. Strahl incorrectly noted that, "the authors of those reports give rather mild

16  to - - mostly mild, but occasionally moderate deficits in terms of [his] level of functioning." *See

17  id*. at 61; *but see id*. at 473-74 (Dr. Strahl was incorrect because Dr. Tobias, who had examined

18  Plaintiff in March of 2011, found that he was *markedly* impaired as to his ability, or lack thereof,

19  to cope with the stress of a routine workday, as well as regarding his ability to maintain emotional

20  stability and predictability); *see also id*. at 473 (Dr. Tobias found that Plaintiff operated in the

21  range of borderline cognitive function as to his: processing speed, visuomotor skills, coordination,

22  cognitive flexibility, concentration, psychomotor speed, attention, symbol searching, and coding).

23         In any event, Dr. Strahl quickly characterized Plaintiff as such: "[h]e is a dysfunctional

24  individual. But the dysfunction is stemming strongly from the substance use disorder . . . in terms

25  of functionality, missing work principally, if I take out substances, you would have a totally

26  different situation." *Id*. at 62, 64. In short, Dr. Strahl testified that without the substance abuse,

27  Plaintiff's limitations in the mental areas of work-related functioning would be mild to moderate

28  at best. *Id*. at 66. When asked to opine about Plaintiff's residual functioning capacity, if substance

abuse and addiction were removed from the equation, Dr. Strahl stated that Plaintiff "would be able to work unabated, with supervisors, unabated with co-workers, [and] up to 70% of the time, with the public . . . respond[ing] to usual changes in the workplace . . . for simple and detailed tasks. I would keep him away from complex tasks. And under such circumstances, he would not miss more than zero to one day per month of work, at the most." *Id*. at 67. The only explanation offered by Dr. Strahl for his rather specific and detailed conclusions about a person with whom he had never interacted was as follows: "at his age, having been through all of this, and being told not to use substances, and then telling the doctor [on some unspecified occasion in the past] as I mentioned in my direct, that he might get better luck with getting disability if he came in more often, [this] tells us that he knows the importance of making choices. And he's making choices based on volition, not based on mental health disorder . . . once you get treatment, and you're in treatment, there's no longer any valid reason to abuse drugs, or alcohol, or any substance, because you're already getting the medications. And, therefore you're making a volitional choice to stop one and do the other. So I don't feel that with him." *Id*. at 68-69; *but see id*. at 651-52 (As recently as December of 2016, Plaintiff's treating psychotherapist, Dr. Aames, characterized Plaintiff's treatment history (or lack thereof) as including such risk factors as his mood disorder, the reported prior suicide attempts, a significant prior history of psychiatric hospitalizations, his difficult social situation, his lack of social support, his substance abuse, and his "relatively *untreated* anxiety and depression") (emphasis added). Thus, despite demonstrating his unfamiliarity with the medical record about which he was rendering such a specific opinion, Dr. Strahl was quite adamant that the entire gamut of Plaintiff's mental health symptoms and limitations would simply diminish if he were to discontinue his substance abuse. *See id*. at 68-72. By way of basis or foundation, Dr. Strahl's entire theorem was based on nothing more than the report of a single statement by Plaintiff on some unspecified occasion wherein he was reported to have once told a physician that he believed he might have a better chance of receiving disability benefits if he visited the doctor's office more often – which Dr. Strahl interpreted as indicative of the notion that everything that has happened to Plaintiff simply boils down to the fact that "he's making choices based on volition, not based on mental health disorder (sic)." *Id*. at 68. On the other hand, Plaintiff's lifelong friend

also testified at the hearing, and when asked by the ALJ to opine about Plaintiff's mental limitations in the absence of substance abuse, she repeatedly testified that the difference would be minimal, explaining that with the substance abuse, "[h]is mental health, that - - it's just a little worse . . . it's not that different." *Id*. at 117-19.

### THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ set forth the applicable law under the required five-step sequential evaluation process. *AR* at 16-18. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date on which the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since April 28, 2016. *AR* at 18. At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). At Step Two, the ALJ found that Plaintiff suffered from the following severe impairments: Crohn's disease, status post-hemicolonectomy; major depressive disorder; stimulant use disorder (methamphetamine); and, cannabis use disorder. *Id*. at 18-19. However, the ALJ determined that Plaintiff's personality disorder and PTSD were non-severe because of the incorrect finding that these conditions appear "more infrequently" in the

United States District Court
Northern District of California

9

1   record than does Plaintiff's depression. *Id*. at 19. As to Plaintiff's diagnoses for anxiety disorder,

2   bipolar disorder, or his mood disorder with psychotic features, the ALJ failed to make any mention

3   of those conditions in the Step Two context whatsoever. *See id*. at 18-19.

4   At Step Three, the ALJ compares the claimant's impairments to the impairments listed in

5   appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the

6   burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant

7   is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful,

8   the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

9   *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

10  combination of impairments that met or medically equaled the severity of any of the listed

11  impairments. *AR* at 19-20, 29-31. Next, and based entirely on the testimony of Dr. Strahl, the ALJ

12  determined that – if he were to discontinue his substance abuse – Plaintiff retained the RFC to

13  perform medium work with the following exceptions and limitations: he is able to occasionally lift

14  50 pounds, while being able to frequently lift 25 pounds; he can stand or walk for 6 hours in an 8-

15  hour day and sit without limitation; he can occasionally climb ladders, ropes, or scaffolds, while

16  being able to frequently climb ramps or stairs, as well as being able to frequently balance, stoop,

17  kneel, crouch, or crawl; he can occasionally be exposed to unprotected heights or moving

18  equipment, while being able to endure frequent exposure to extreme temperatures, vibrations,

19  humidity, and pulmonary irritants; he can frequently operate motor vehicles; he can interact with

20  the general public for 70% of the workday; he is able to perform both simple and detailed tasks

21  (but not complex tasks); and, Plaintiff could be expected to be absent from work no more than 1

22  day each month. *Id*. at 31-35

23  At Step Four, the ALJ determined that – even with the discontinuation of substance abuse

24  – Plaintiff would be unable to perform his past relevant work. *Id*. at 35. Next, at Step Five, the

25  ALJ concluded that if Plaintiff stopped the substance abuse, he could perform the job requirements

26  of an office clerk, a cleaner, or a cafeteria attendant. *Id*. at 35-36. Thus, finding that Plaintiff's

27  drug addiction is a material contributing factor to the determination of disability (given that

28  Plaintiff would not be disabled if he stopped the substance use), the ALJ concluded that Plaintiff

United States District Court
Northern District of California

1    has not been disabled, as defined in the Social Security Act, since the alleged onset date stated in

2    his application. *Id*. at 36.

3                                                    **DISCUSSION**

4          The ALJ made a series of errors in this case, all of which are rooted in the wholesale

5    reliance on Dr. Strahl's unsupported opinion. First, the ALJ erroneously determined that Plaintiff's

6    personality disorder and PTSD were non-severe because of the misguided notion that those

7    conditions appear "more infrequently" in the record than does Plaintiff's depression. *See id*. at 19.

8    Nowhere in any of the cases setting forth the legal regime for severity determinations under Step

9    Two can there be found anything resembling a frequency quota for how many times an illness

10   must be mentioned before an ALJ can consider it to be severe. As to Plaintiff's diagnoses for

11   anxiety disorder, bipolar disorder, or his mood disorder with psychotic features, the ALJ failed to

12   make any mention of those conditions at all in the course of making the Step Two determinations

13   in this case. *See id*. at 18-19.

14         It is well established that the evaluation of claimed impairments at Step Two of the

15   sequential evaluation process is a *de minimis* test intended to weed out the most minor of

16   impairments, as well as functioning as a screening device to dispose of patently groundless claims.

17   *See Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987); *Edlund v. Massanari*, 253 F.3d 1152, 1158

18   (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)); *Webb v. Barnhart*,

19   433 F.3d 683, 687 (9th Cir. 2005). Thus, a finding of non-severity at Step Two must be "clearly

20   established by medical evidence" (*see id*.), and if a claimant meets her evidentiary burden under

21   Step Two's *de minimis* standard, an ALJ "must find that the impairment is 'severe' and move to

22   the next step" in the five-step evaluation process. *See Edlund*, 253 F.3d at 1160. For these reasons,

23   "[a]mple authority cautions against a determination of nondisability at step two." *Ortiz v.*

24   *Commissioner of Social Sec.*, 425 F. App'x 653, 655 (9th Cir. 2011) (citing *Yuckert*, 482 U.S. at

25   153; *Webb*, 433 F.3d at 686; and, *Smolen*, 80 F.3d at 1290).

26         In this case, it cannot be reasonably contended that any of Plaintiff's mental illnesses were

27   patently groundless claims, or that the medical evidence of record failed to establish any of them

28   clearly, or that they were suitable for Step Two screening due to qualifying as the most minor of

United States District Court
Northern District of California

impairments. As described in greater detail above, during a consultative examination, Dr. Tobias diagnosed Plaintiff with a mood disorder attended with psychotic features, explaining that the condition would seriously interfere with his ability to withstand stress, maintain emotional stability, or interact with others. *See id*. at 467. Then, during one of his many episodes of psychiatric hospitalization, Dr. Clague treated Plaintiff for depression and bipolar disorder. *See id*. at 842-43. On another occasion of psychiatric hospitalization, Dr. Vilania diagnosed Plaintiff with depressive disorder and anxiety disorder, finding him to be a danger to himself due to a persistent risk of suicide. *See id*. at 867-69. Similarly, his treating physician at the Native American Health Center, Dr. Zamani, consistently diagnosed Plaintiff as suffering from chronic bipolar disorder, anxiety disorder, depressive disorder, and PTSD. *See id*. at 489-91, 495-96, 498-500. Finally, during the lengthy course of his psychotherapy at Trust Lifelong Health Center, in 2016 and 2017, Dr. Aames repeatedly diagnosed him with chronic PTSD, recurrent-episode major depressive disorder with psychotic features and anxious distress, a personality disorder, and a mood disorder. *See id*. at 652-53, 669-72, 691, 698, 700, 705, 707-08, 710, 712, 715, 717, 720, 722-23, 725, 727, 728, 730, 734, 736, 739-40, 743, 746-47, 755, 758, 759, 762-64, 769, 771. Accordingly, the court finds that the ALJ's Step Two determinations were not based on substantial evidence, and that, in fact, the ALJ simply overlooked the overwhelming bulk of the medical record in this case, which clearly established the severity of the above-noted mental impairments.

The ALJ's next errors can be found in the failure to properly and fairly develop the record as to the effect of Plaintiff's drug addiction on the functional limitations attending his documented mental illness conditions by seeking such input from one of Plaintiff's many treating physicians, or at the very least, an independent and unbiased examining source. While the ALJ secured opinion evidence from a non-examining consultant (Dr. Strahl), this was a woefully inadequate effort at developing a full and fair record on which to make a disability determination. First, as noted above, Dr. Strahl made it abundantly clear that his familiarity with the record evidence was imperfect to say the least. Second, Dr. Strahl's only explanation for his opinion (that Plaintiff would experience little to no limitations based on his mental impairments if he were to simply discontinue his substance abuse) falls short of making any sense at all – especially in light of the

United States District Court
Northern District of California

1   compelling picture painted by the great weight of the medical evidence in this case. To put it

2   simply, the evidence in this case paints the picture of an injured and damaged psyche that is

3   operating the very edge of its ability to cope. Dr. Strahl's puzzling explanation – about Plaintiff

4   once saying more doctor visits might help his chances at securing a favorable disability

5   determination – is simply incapable of upending what is otherwise a very clear evidentiary picture.

6   Nor does that explanation in any way serve to assist in understanding how Dr. Strahl arrived at the

7   conclusion that *but for* the fact of his drug addiction, Plaintiff's mental illnesses would be largely

8   benign in terms of functional limitations.

9           Within the four corners of this case, Dr. Strahl's opinion is unique – such a notion appears

10   nowhere else in the record. Therefore, because Dr. Strah's opinion was devoid of any reasonable

11   explanation, because it was not based on any quantum of evidence *from this case* (let alone

12   'substantial evidence'), and, because this opinion cannot be construed as constituting substantial

13   evidence, in and of itself, the ALJ erred by giving it controlling weight in order to determine that

14   but for the drug addiction, Plaintiff's mental impairments would be attended with little to no

15   limitations. *See Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) ("[t]he opinion of a non-

16   examining physician cannot by itself constitute substantial evidence that justifies the rejection of

17   the opinion of either an examining physician or a treating physician."); *see also Revels v.

18   Berryhill*, 874 F.3d 648, 654-55 (9th Cir. 1995); *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67

19   n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v.

20   Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). Since no other examining or treating professional (of

21   the many involved in this case) had rendered any such suggestion at all, the ALJ essentially

22   rejected the entire body of opinion evidence in this case (as it related to Plaintiff's functional

23   limitations stemming from his mental illness) in favor of the unsupported opinion of a non-

24   examining consultant. To make matters worse, Dr. Strahl's unexplained opinion appears to be

25   based on some combination of his personal experiences and his preconceived notions about

26   addiction and substance abuse in general, rather than being based on any of the specific or

27

28

1  particular features and experiences of Plaintiff's mental health condition.[3]

2       If the ALJ had questions about the effects of Plaintiff's addiction on his mental illnesses, it

3  was incumbent on the ALJ to develop the record in a manner attended with a significantly greater

4  degree of fairness to Plaintiff and his interests than was the case here. It is well established that

5  "[t]he ALJ in a social security case has an independent 'duty to fully and fairly develop the record

6  and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144,

7  1151 (9th Cir. 2001) (*quoting Smolen*, 80 F.3d 1273, 1288 (9th Cir. 1996)). Because

8  administrative proceedings of this sort are inquisitorial in nature, the ALJ must scrupulously and

9  conscientiously probe into the matter and actively explore for any and all relevant facts. *See*

10

11  ---

[3] *See e.g.*, *Kizzy B. v. Saul*, No. 18-cv-05568-SK, 2020 U.S. Dist. LEXIS 144009, at *10 (N.D. Cal. Mar. 5, 2020) ("Strahl noted that, when 'clean and sober, her functionality would be markedly improved.'"); *Keith*

12  *R. v. Saul*, No. 2:17-cv-226, 2019 U.S. Dist. LEXIS 132209, at *20 (D. Vt. Aug. 7, 2019) ("Dr. Strahl's conclusions, including his finding that Mr. R. could likely perform detailed and complex tasks due to his

13  ownership of a restaurant, are largely unsupported."); *Derry v. Comm'r of Soc. Sec.*, No. 1:18-cv-00090-SLC, 2019 U.S. Dist. LEXIS 70427, at *12 (N.D. Ind. Apr. 24, 2019) ("In a nutshell, Dr. Strahl opined that

14  when Derry was taking his medication as prescribed and not using substances, he could do simple work requiring minimal contact with supervisors and the public, and occasional contact with coworkers.");

15  *Roman v. Berryhill*, Civil No. 18-cv-787-PB, 2019 U.S. Dist. LEXIS 120433 *11 (D. N.H. 2019) ("Dr. Strahl offered testimony that when Roman was using alcohol and/or marijuana, his mental impairments

16  satisfied the paragraph B criteria of Listings 12.04, 12.06, and 12.08, but would not satisfy the paragraph B criteria if he were to abstain from using those substances."); *Wooten v. Berryhill*, No. 6:17-cv-00486-AKK,

17  2018 U.S. Dist. LEXIS 164038, at *1 (N.D. Ala. Sep. 25, 2018) (". . . in particular because the ALJ relied in part on the erroneous finding of Dr. Nathan Strahl, the court finds that the ALJ's conclusion that alcohol

18  abuse is a contributing factor material to the determination of disability is not supported by substantial evidence. Therefore, the court reverses and remands for further consideration."); *Wick v. Berryhill*, No.

19  16cv1987 JM (AGS), 2017 U.S. Dist. LEXIS 155555, at *4 (S.D. Cal. Sep. 22, 2017) ("Dr. Nathan Strahl testified that Plaintiff's schizophrenia likely resulted from his drug abuse."); *Wick v. Berryhill*, No. 16-cv-

20  1987-JM-AGS, 2017 U.S. Dist. LEXIS 127359, at *3 (S.D. Cal. Aug. 10, 2017) ("A psychiatric expert, Nathan Strahl, M.D., testified that 'some adverse event' related to Wick's substance abuse likely triggered

21  his descent into schizophrenia. In Dr. Strahl's opinion, if Wick had stayed on his medications and not abused drugs, his condition would not have deteriorated so badly and he 'likely would not be disabled.'");

22  *Rowell v. Comm'r of Soc. Sec.*, No. 3:14-cv-00250-GHD-DAS, 2015 U.S. Dist. LEXIS 148844, at *12-13 (N.D. Miss. Nov. 3, 2015) ("Dr. Strahl assessed Rowell's limitations with and without substance abuse and

23  concluded that without substance abuse and some mental treatment Rowell could do simple repetitive routine tasks."); *Urtecho v. Colvin*, No. 5:14cv155/CJK, 2015 U.S. Dist. LEXIS 125877, at *19 (N.D. Fla.

24  Sep. 18, 2015) (Dr. Strahl testified that "[w]ith sobriety, he would have no episodes of decompensation; the past episodes were due to substance abuse."); *Wright v. Colvin*, No. 12-21773-CIV, 2014 U.S. Dist. LEXIS

25  94467, at *15 (S.D. Fla. July 11, 2014) ("Dr. Strahl opined that Wright's substance abuse 'greatly and gravely' influenced the formal IQ testing performed by Dr. Marban."); *Shoulars v. Astrue*, 671 F. Supp. 2d

26  801, 812 (E.D.N.C. 2009) ("Nathan Strahl, M.D. and Ph.D., a board-certified psychiatrist, testified as an ME at the administrative hearing. [] The ME explained that Claimant's medical issues are 'in many ways

27  secondarily stemming' from his 'alcohol abuse.'"). Thus, it appears that in cases of mental impairments ranging from schizophrenia to intellectual disability, if a drug or alcohol addiction is also involved, Dr.

28  Strahl invariably arrives at the conclusion that, one way or another, were it not for the drug or alcohol addiction, the claimant would experience no significant mental health limitations.

*Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (citing *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992)). If there is so much as an ambiguity in the evidence, or if the ALJ – or a reviewing court – finds that the record is inadequate for proper evaluation of the evidence, such a finding likewise triggers the ALJ's duty to conduct an appropriate inquiry. *See Tonapetyan*, 242 F.3d at 1151 (citing *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)).

The ALJ's duty to develop the record does not depend on a claimant's representation status, and that the duty applies with equal force in the cases of the represented as well as the unrepresented claimant. *Tonapetyan* at 1150. Most importantly, in all cases where a claimant may be mentally ill and unable to adequately protect his or her own interests (regardless of the claimant's representational status), the ALJ's duty to develop the record is heightened. *Id.* (citing *Higbee*, 975 F.2d at 562); *see also DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990) ("In cases of mental impairments, this duty [to develop the record] is especially important."); *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (a claimant need only "raise a suspicion" about his or her impairment in order to trigger the ALJ's duty to develop the record).

Thus, because Social Security proceedings are inquisitorial rather than adversarial, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 110-11 (citing Dubin, *Torquemada Meets Kafka: The Misapplication of the Issue Exhaustion Doctrine to Inquisitorial Administrative Proceedings*, 97 Colum. L. Rev. 1289, 1301-1305, 1325-1329 (1997)); *see also Richardson v. Perales*, 402 U.S. 389, 400-01 (1971) ("This, we think, is as it should be, for this administrative procedure, and these hearings, should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation. This is the obvious intent of Congress so long as the procedures are fundamentally fair."). Accordingly, the ALJ must take reasonable steps to ensure that the issues and questions raised by the medical evidence are carefully and properly addressed, by an appropriate professional with the relevant professional background and armed with the necessary knowledge, so that the disability determination may be fairly made on a sufficient evidentiary record, whether favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); *see also*

*Smolen*, 80 F.3d at 1288 ("If the ALJ thought he needed to know the basis of [a doctor's] opinion[] in order to evaluate [it], he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physician[ ] or submitting further questions to [him or her]."). In fact, when it is necessary to enable the ALJ (and by extension, a reviewing court) to resolve a disability issue, the ALJ's duty to develop the record may require ordering a consultative examination. *See Tonapetyan*, 242 F.3d at 1150 (the ALJ may develop the record in several ways, including by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record).

Here, rather than discharging the duty to "investigate the facts and develop the arguments both for and against granting benefits," (*Sims*, 530 U.S. at 110-11), the ALJ overlooked the entire assemblage of Plaintiff's treating physicians and psychotherapists (Drs. Clague, Vilania, Zamani, and Aames) and instead relied entirely on the unfounded opinion of a doctor who had neither examined nor treated Plaintiff, and had not even demonstrated a reasonable degree of familiarity with the record in this case. Thus, rather than discharging the duty to fairly develop the record as to the effect of Plaintiff's addiction on his mental health in light of his mental illnesses, the ALJ simply rejected Plaintiff's testimony (as well as the accounts of Plaintiff's lifelong friend), while also overlooking the opinions rendered by his doctors, all of which had implicitly rejected the notion that Plaintiff's chief source of mental limitation was his substance abuse.

Accordingly, because Dr. Strahl's opinion about the effect of Plaintiff's drug addiction is not based on substantial evidence – indeed, because it is contradicted by the great weight of the evidence in this case – the ALJ erred by basing the entirety of the evaluation process from Step Two forward on that opinion. Instead, the court finds that Dr. Strahl's opinion was due to be rejected outright and given no weight at all. On remand, the Commissioner is **ORDERED** to either reengage the sequential evaluation process from Step Two forwards without any reliance on Dr. Strahl's opinion, thereby finding Plaintiff disabled (the ALJ already found that Plaintiff was disabled, but that – based on Dr. Strahl's opinion – the cause was substance abuse); or, if need be, to solicit an opinion regarding the effects of substance abuse on Plaintiff's impairments, by

subpoena or otherwise, from Dr. Ted Aames, Plaintiff's treating psychotherapist (who is uniquely well-situated to render a reliable opinion on the subject, given his lengthy treatment relationship with Plaintiff), and then to reengage the sequential evaluation process in a manner consistent with the instructions and guidance provided above.

The court declines to address Plaintiff's remaining issues not only because they can be adequately addressed on remand, but also because the calculus underlying those issues will likely change on remand given the mandate on remand. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Gutierrez v. Comm'r of Soc. Sec.*, No. 18-cv-02348-RMI, 2019 U.S. Dist. LEXIS 165711, at *30-31 (N.D. Cal. Sep. 25, 2019); *Abdul-Ali v. Berryhill*, No. 18-cv-03615-RMI, 2019 U.S. Dist. LEXIS 138512, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand."). On remand, the Commissioner is **ORDERED** to consider the other issues raised in Plaintiff's briefing and modify the ensuing ALJ opinion as appropriate. *See Cortes v. Colvin*, No. 2:15-cv-02277-GJS, 2016 U.S. Dist. LEXIS 40580, 2016 WL 1192638, at *4 (C.D. Cal. Mar. 28, 2016); *Cochran v. Berryhill*, No. 3:17-cv-00334-SB, 2017 U.S. Dist. LEXIS 212380, at *21 (D. Or. Dec. 28, 2017).

## CONCLUSION

Thus, for the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 14) is **GRANTED**, and Defendant's Cross-Motion (dkt. 15) is **DENIED**. The case is **REMANDED** for further proceedings pursuant to the instructions provided herein.

**IT IS SO ORDERED.**

Dated: March 16, 2021

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California

17